No. 25-14302-P

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

FRANK A. WALLS,

Plaintiff-Appellant,

v.

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS, ET AL.,

Defendants-Appellees.

_____

On Appeal from the United States District
Court for the Northern District of Florida

_____

## EMERGENCY MOTION FOR STAY OF EXECUTION
_____

## *** EXECUTION SCHEDULED FOR DECEMBER 18, 2025, 6:00 P.M. ***

Linda McDermott
  Chief, Capital Habeas Unit
Sean Gunn
Michelle Ward
Bailey Ellicott
Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301-1300
(850) 942-8818
sean_gunn@fd.org

*Counsel for Plaintiff-Appellant*

*Walls v. Secretary, Florida Department of Corrections, et al.*    No. 25-14302-P

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

**Interested Persons:**

Barron, Robert (Circuit Judge for Okaloosa County)

Ellicott, Bailey (Counsel for Plaintiff-Appellant)

Fontán, Julissa (State-Court Counsel for Plaintiff-Appellant)

Grinstead, Albert (Assistant State Attorney)

Gunn, Sean (Counsel for Plaintiff-Appellant)

LoBianco, Jack (State-Court Counsel for Plaintiff-Appellant)

Loveless, Earl (Trial Counsel)

McDermott, Linda (Chief of Federal Public Defender CHU)

Millsaps, Charmaine (Assistant Attorney General)

Molchan, John (Assistant State Attorney)

Moody, Ashley (Florida Attorney General)

Montango, Megan (State-Court Counsel for Plaintiff-Appellant)

Nowalk, Hannah (Assistant State Attorney)

Peterson, Ann (Victim)

Pinkard, Eric (Capital Collateral Regional Counsel – Middle)

Rodgers, M.C. (Federal District Judge)

Stone, William (Circuit Judge for Okaloosa County)

C-1

Walker, Mark (Federal District Judge)

Walls, Frank (Plaintiff-Appellant)

Ward, Michelle (Counsel for Plaintiff-Appellant)

**Corporate Disclosure:** N/A

## EMERGENCY MOTION FOR STAY OF EXECUTION

### I.    Introduction

Frank Walls is scheduled to be executed by the State of Florida on December 18, 2025. Six months ago, before his death warrant was signed, Walls exhibited troubling symptoms, prompting counsel to retain a medical expert to examine him. That examination revealed serious ongoing medical conditions that, when coupled with Florida's anomalous, etomidate-based lethal injection protocol, will likely result in Walls suffering a torturous execution akin to drowning. While continuing to investigate the ramifications of Walls's declining health, six weeks ago, counsel received alarming records showing that, over the course of an unprecedented number of Florida executions in 2025, corrections officials have either willfully or negligently deviated from their drug protocol. Shortly thereafter, the Governor signed Walls's death warrant.

Within one week of his death warrant, Walls filed suit against corrections officials under 42 U.S.C. § 1983, arguing that executing him using Florida's current lethal injection protocol and practices would violate the Eighth Amendment due to "a demonstrated risk of severe pain" that is "substantial when compared to the known and available alternatives." *Glossip v. Gross*, 576 U.S. 863, 877-78 (2015). In connection with his as-applied challenge, Walls sought a preliminary injunction preventing Defendants from executing him as scheduled. Walls proffered his

medical expert's report, and the recently obtained execution records, and requested an evidentiary hearing on his preliminary-injunction request.

The district court refused to hold a hearing and denied Walls's request for a preliminary injunction and stay of execution. The district court conceded that "Walls has presented evidence demonstrating that he may well suffer a cruel death by experiencing a feeling akin to drowning." NDFL-ECF 22 at 10-11. But the court did not even consider the likelihood of success on the merits, because it found Walls waited too long to bring suit. That decision was wrong and likely to be reversed. Not only did the district court fail to apply any of the four required factors for a stay or injunction, its undue-delay analysis was factually and legally erroneous. Because Walls is substantially likely to succeed, both in this appeal of the district court's order and on the merits of his § 1983 claim, this Court should grant a stay of his scheduled December 18 execution and allow full briefing.

## II. Background

Florida's current method of execution is a three-drug lethal injection protocol (hereinafter the "Protocol") employing successive intravenous injections of 200 milligrams of etomidate, a sedative, followed by 1000 milligrams of rocuronium bromide, a paralytic agent, and 240 milliequivalents of potassium acetate, which stops the heart. NDFL-ECF 1 at ¶ 21. Defendant Ricky Dixon, the Secretary of the Florida Department of Corrections ("DOC"), last certified DOC's ability to carry

2

out the Protocol with regard to any prisoner, without contingencies for any varying medical concerns, on February 18, 2025. *Id.* at ¶ 11.

In July 2025, Walls exhibited serious signs of deteriorating health. *Id.* at ¶¶ 32-33. He began experiencing dizzy spells that caused him to feel as if he was hyperventilating. *Id.* at ¶ 32. He also had observable difficulty speaking without stuttering and struggled to catch his breath after walking only short distances. *Id.*

In response, counsel contacted Dr. Joel Zivot, M.D., and requested that he conduct a physical examination of Walls. *Id.* at ¶ 33. After reviewing Walls's medical records, Dr. Zivot examined him on July 23, 2025, and expressed serious concern about his medical vulnerabilities should Defendants execute him with the Protocol. *Id.*; NDFL-ECF 1-1 at 19.

Dr. Zivot's evaluation revealed an array of severe medical conditions that indicate poor respiratory and cardiac functioning. Walls is a 354-pound man, *id.* at 82, with chronic physical ailments consisting of "hypertension, hyperlipidemia (elevated cholesterol), a thyroid disorder requiring thyroid hormone replacement, gastrointestinal reflux, obesity, obstructive sleep apnea requiring the nightly use of a CPAP machine." *Id.* at 20. Walls's blood-oxygen saturation—an important measure of his health—also declined sharply, to 87%-92%. This drop is particularly concerning because Walls uses a CPAP machine nightly to aid breathing. *Id.* at 21. Dr. Zivot noted this significant decrease likely "reflects worsening chronic

3

pulmonary insufficiency related to his long-standing obstructive lung disease over this time." *Id.* at 21. Severely low blood oxygen saturation explained Walls's symptoms of dizziness and confusion. Medical professionals normally advise those with blood oxygen below 88% to seek immediate medical attention. *Id.* at 21. In this case, Dr. Zivot found that this significant decrease, in light of Walls's use of a CPAP machine, "represents a severe decline" in Walls's health. *Id*. at 22.

Thereafter, counsel received DOC records demonstrating that Defendants' ability to carry out the Protocol is rife with error, further elevating Walls's claim that he is in imminent danger. NDFL-ECF 1 at ¶ 78. The records revealed that Defendants have a pattern of neglecting to record the removal of execution drugs on the dates of execution, raising serious alarms about the chain of custody and internal handling of the lethal chemicals. For example, while Michael Bell was executed on July 15, 2025, the log reflects that the rocuronium bromide and potassium acetate were removed the next day. And there is no entry indicating that etomidate, was removed for Bell's execution at all.[1] *Id.* at ¶¶ 77-84. Defendants recorded that they removed all three drugs used in Thomas Gudinas's execution on June 25, 2025, despite the execution taking place on June 24. For Anthony Wainwright's execution, Defendants inexplicably waited two days to record the drugs used. *Id.* at ¶ 79.

---

[1]    Bell's autopsy report indicates etomidate was present in his blood, but the source and quantity of the drug used is unknown.

The records also show that Defendants consistently prepare the incorrect quantity of drugs used in executions. On June 25, 2025, a date corresponding to Gudinas's execution, the drug logs only show 10 x 10ml vials of rocuronium bromide were removed (1000mg), suggesting that Defendants only prepared half of the drug, in violation of the protocol. This happened again during the Wainwright execution, where Defendants only removed 7 vials of potassium acetate, despite the protocol calling for 12. *Id.* at ¶¶ 81-82.

Other deviations include a documented tendency to improvise, as the logs show that during the executions of Edward James and Michael Tanzi, Defendants administered lidocaine, an anesthetic drug not called for in the Protocol. *Id.* at ¶ 83.

Finally, Defendants indicate on the logs that they used etomidate with an expiration date of January 31, 2025, during the executions of Victor Jones on September 30, David Pittman on September 17, Curtis Windom on August 28, and Kayle Bates on August 19, 2025. *Id.* at ¶ 84.

Prior to counsel receiving the records on October 28, 2025, there was no indication that there were any internal errors in Defendants' ability to carry out the Protocol as written. The records added further support to Walls's claim because as a vulnerable inmate already, the risk of maladministration coupled with his health issues increases the likelihood of a torturous execution for Walls.

5

Governor DeSantis signed Walls's death warrant on November 18, 2025, setting his execution for December 18, 2025.

Walls filed his § 1983 complaint and requested a preliminary injunction on November 26, 2025, and separately sought a stay of execution on December 3. NDFL-ECF 13. Walls also sought expedited discovery, seeking records and depositions that would explain the documented errors in Defendants' adherence to the Protocol. NDFL-ECF 21. The district court denied Walls's motion for a stay on December 9, 2025. NDFL-ECF 22. The next day, the district court denied Walls's request for discovery. NDFL-ECF 28. Defendants' motion to dismiss Walls's underlying § 1983 complaint, NDFL-ECF 14, remains pending.

## III.    The stay factors weigh in favor of granting a stay of execution

This Court may grant a stay of execution if the petitioner "establishes that (1) he has a substantial likelihood of success on the merits, (2) he will suffer irreparable injury unless the injunction issues, (3) the injunction would not substantially harm the other litigant, and (4) if issued, the injunction would not be adverse to the public interest." *Barwick v. Governor of Fla.*, 66 F.4th 896, 900 (11th Cir. 2023).

### A.    Substantial likelihood of success

The first stay factor—substantial likelihood of success—favors Walls. There is a substantial likelihood that Walls succeeds in this appeal of the district court's order, and on the merits of his § 1983 claims.

6

**1.    There is a substantial likelihood of the district court's order being reversed on appeal**

First, the district court's order is likely to be reversed on appeal. The district court abused its discretion when it disposed of Walls's stay and injunction request without considering any of the four required factors noted above. This Court has made clear that courts faced with requests for stay or injunctive relief *must*, at least, consider the likelihood of success on the merits and relative harm to the parties. Although undue delay can form part of the analysis, the district court was wrong to completely ignore the serious allegations and evidence in the complaint.

Before granting a stay, "a district court *must* consider not only the likelihood of success on the merits and the relative harm to the parties, but *also* the extent to which the inmate has delayed unnecessarily in bringing the claim." *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004) (emphasis added). The language of the rule announced in *Nelson* assumed that lower courts would consider the likelihood of success and relative harm presented to the parties when deciding whether to grant a stay. Even in cases where this Court found that the equities of a requested stay weighed against the request, this Court nonetheless also considered the other factors identified in *Nelson*. *See, e.g., Long v. Sec'y, Dep't of Corr.*, 924 F.3d 1171, 1178-1179 (11th Cir. 2019) (considering whether petitioner demonstrated a likelihood of success on the merits on a motion for stay in addition to the equities of the stay).

In the order below, the district court conducted no analysis of Walls's likelihood of success on the merits or the relative harm to the parties. *See generally* NDFL-ECF 22. Instead, the district court only considered whether Walls had unduly delayed in bringing his lethal injection challenge, hinging its denial of a stay entirely on the question of equity. *Id.* at 7-12.

While some outlier Eleventh Circuit cases have decided requests for stays solely on equitable grounds, Walls's case does not present the kind of "abusive delay" and "manipulation" that weigh against granting a stay. *See Gomez v. United States Dist. Court*, 503 U.S. 653, 653-54 (1992) (noting that equity weighs against granting stays requested by petitioners that litigate in bad faith). Instead, as explained below, Walls did not unduly delay in bringing this claim, and the equities weighed in favor of granting his stay, in addition to all of the other stay factors that courts "must consider." *Nelson*, 541 U.S. at 649.

Even if it had been proper for the district court to fully bypass the disturbing evidence, that Walls may be subjected to torture, the district court still erred in finding undue delay, both as to Walls's medical conditions and as to Defendants' pattern of maladministration of the drug protocol. The district court erred in large part because it ignored Walls's proffer as to his deteriorating health, which reached a tipping point in July 2025, and the execution records from DOC, obtained only on October 28—just three weeks before the Governor signed Walls's death warrant.

8

The district court missed that Walls's Eighth Amendment claim relies on two factors: (1) his deteriorated health that culminated in July, and (2) the Defendants' pattern of maladministration of the Protocol. Among other things, the logs show that Defendants routinely fail to adhere to their own protocol, leading to severe mishaps like preparing inadequate dosages of drugs for executions and administering expired drugs. These two factors cumulatively increase the risk of a severely painful outcome during Walls's execution. *See* NDFL-ECF 13 at 3-4; *see also King v. Parker*, 467 F. Supp. 3d 569, 573 (M.D. Tenn. 2020) (coupling claim regarding maladministration of lethal injection protocol with the risk of pain from administration of midazolam and finding the claim sufficient, taken together, to survive summary judgment). Inexplicably, the district court failed to analyze the effect of the October 28 records in its timing analysis.

Because Walls's claim relies, in part, on the DOC records, and they were uncovered a matter of weeks before his warrant was issued, Walls was not dilatory. Walls first noted sensations of hyperventilating and near-fainting in July and was evaluated later that month by Dr. Zivot. But due diligence still required counsel to thoroughly investigate the basis for Walls's complaint before filing one, which is part of the reason there is a multi-year statute of limitations for such claims. *See Hamm v. Comm., Ala. Dept. of Corr.,* CA11, No. 18-10473, ECF 20-1 at 5 (Feb. 13, 2018). Due diligence investigation is what Walls endeavored to do between the end

9

of July and October. In fact, it was due diligence that led to the discovery of Defendants' DOC records on October 28. Walls was still actively investigating his claim when the Governor signed his execution warrant in November.[2]

Walls could not be expected, in good faith, to have filed a complaint prior to investigating its basis—particularly when the statute of limitations allowed him two years. But that is exactly what the district court would require. Walls essentially would be obligated to file a complaint at the first sign of smoke—effectively accelerating the statute of limitations for death-sentenced individuals to be immediate upon discovery, or, at the latest, one day before any warrant is signed.[3] The district court failed to explain at what point capital defendants should file medical based claims—whether at the first onset of symptoms, the first diagnosis of a condition, the diagnosis of a complicating condition, etc. Particularly given the seriousness of the complaint, the district court's parsing of timing was wrong. The expectations the district court thrust on Walls were impracticable.

The district court's finding that Walls could have filed this suit years ago is similarly flawed. NDFL-ECF 22 at 11. First, the district court took issue with the

---

[2]    Walls requested records about previous executions on November 3, 2025. His requests remain pending.

[3]    While clarifying that it does not expect a plaintiff to file his complaint as soon as he receives medical records, the district court's opinion in practice does exactly that. There is no meaningful way to distinguish what is long enough or too long if any due-diligence investigation can be "fatal to his claim." *See* NDFL-ECF 22 at 9.

documentation Walls provided in his complaint that supports that (1) pulmonary edema is a known risk to certain inmates executed by the Protocol, and therefore Walls's concerns are rooted in fact; and (2) other courts and jurisdictions have reached the conclusion that when pulmonary edema does occur, it is generally considered to be cruel and unusual punishment satisfactory of *Glossip*'s first prong. *Id.* at 4-5. It is unclear how else Walls would have proven his point. In his complaint, Walls is steadfast in his claim that he is at an increased risk of this outcome given his medical conditions. How Walls would have been able to document his claim, or support it with legal precedent, without using examples from other jurisdictions and prior litigation, is not explained by the district court.

The district court missed the point. Walls pleaded this evidence to show the existing possible risks when the Protocol is administered to him. Acknowledging that this evidence is "publicly known, well-documented, compelling evidence", *id*. at 5, the court opted to treat Walls's claim as a facial challenge instead. It is not. This is a case-specific challenge to Defendants using their Protocol to kill a medically vulnerable prisoner like Walls during a sloppy, breakneck pace of executions. While the district court's order attempts to suggest that Walls could have raised a separate—and additional—facial challenge to Florida's lethal injection protocol, that does not make this as-applied challenge dilatory.

11

The district court pointed to prior diagnoses in Walls's DOC medical records as further evidence of delay. NDFL-ECF 18 at 6, 9. But health conditions are not static, and the recent significant cardiopulmonary changes are central to Walls's cause of action. Prior to July, Walls's health had not reached a point that would implicate a constitutionally unacceptable risk of needless suffering. Further, mere pre-existing diagnoses in medical records do not equate to the cumulative, bleak picture of Walls's current health—a picture that Dr. Zivot predicts would lead to disastrous effects if he is executed by Defendants' Protocol.[4] This cause of action could only have been brought if Walls's health deteriorated to such an extent that implicated the Eighth Amendment. That did not occur until July, at the earliest.

The district court improperly relied on *Long*, which supports Walls's position more than it undermines it. The delays in *Long* were markedly different than any minimal delays here. Long's complaint challenged Florida's lethal injection process both on its face and as applied. Long's first cause of action alleged that Florida's use of a three-drug protocol, instead of a one-drug protocol, violated the Eighth Amendment. *Long*, 924 F.3d at 1177. Long filed his challenge more than two years after Florida began using etomidate and decades after Long presented mitigating

---

[4]    Again, the district court's order creates an impracticable result. If the mere existence of prior diagnoses causes Walls's claim to fail, yet as the district court confusingly concedes, counsel is "not expected" to file immediately upon receipt of medical records, there is no discernable time when the court *would* find it appropriate for Walls to file his complaint.

evidence at his trial of the same medical conditions underlying his claim. *Id*. Long

also alleged recent executions were irregular. But, as the court noted, it was unclear

whether he relied on the executions for timing. At best, the most recent complained-

of execution was five months prior. *Id*. *Long* is thus clearly distinguishable from

Walls's case. Here, Walls relies on a significant change in his medical condition

uncovered in July *and* specific drug log records obtained on October 28. Walls had

far less delay.[5]

The district court's fundamental problem with the timing of Walls's complaint

seems to be that it was filed after his death warrant was signed and execution date

set for 30 days later. But the fact of an active death warrant does not mean that any

litigation filed during the death warrant was unduly delayed. Walls's § 1983 claims

---

[5]    The district court also took issue with Walls filing his stay motion, pursuant to the court's scheduling order. Walls filed his complaint on Wednesday, November 26, 2025. NDFL-ECF 1. The complaint included a request for a preliminary injunction. That same date, the district court ordered the parties to confer and file a proposed scheduling order. NDFL-ECF 10. The district court adopted the agreed-upon scheduling order on December 1, 2025. NDFL-ECF 12. Pursuant to that order, Walls filed a separate motion for a stay of execution and preliminary injunction on December 3, 2025. NDFL-ECF 13. For the district court to adopt the proposed schedule, and then fault counsel for filing according to the adopted schedule, was unreasonable. Even assuming Walls had filed a stay motion simultaneously with his complaint, the outcome would be the same. The "strong equitable presumption against the grant of a stay" in *Long* turns on whether "a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Long*, 924 F.3d at 1176 (quoting *Nelson*, 541 U.S. at 650). Because a stay would be necessary, the timing of the motion made no difference. And, as noted, the complaint had already requested a preliminary injunction.

had a statute of limitations of two years, which he more than satisfied. It was not Walls who chose the timing of the death warrant. Under the district court's logic, Walls should have divined that the Governor would sign his warrant on November 18, 2025. And, thus, the only appropriate time for Walls to file this complaint and accompanying stay motion was between October 28 and November 18, 2025—and without the benefit of continued investigation. This would be an impracticable result. Under the circumstances, filing his complaint one week after his warrant was signed without notice, shows diligence rather than delay.

### 2. There is a substantial likelihood that Walls's § 1983 claims succeed on the merits

Second, although completely ignored by the district court, Walls's § 1983 claims are likely to succeed on the merits. Though the district court dismissed Walls's claim solely on grounds of undue delay, it also suggested that Walls may have pleaded sufficient information to survive the Rule 12(b)(6) stage. *See* NDFL-ECF 22 at 10-11 ("This Court acknowledges that Walls has presented evidence demonstrating that he may well suffer a cruel death by experiencing a feeling akin to drowning as the result of pulmonary edema."). It is therefore substantially likely that, upon full briefing and with the benefit of the discovery Walls requested, the district court and this Court would ultimately find that Walls succeeds on the merits.

Pursuant to the Supreme Court's instruction in *Glossip*, to support his as-applied lethal injection claim Walls is required to demonstrate both that the method

14

of execution poses a "'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Price v. Commissioner*, 920 F.3d 1317, 1326 (11th Cir. 2019) (quoting *Glossip*, 576 U.S. at 877). Walls must also show that the risk of harm is "substantial when compared to the known and available alternatives." *Glossip*, 576 U.S. at 878. Walls has met these requirements under both the Rule 12(b)(6) standard and for the substantial likelihood of success on the ultimate merits.

At issue here is the link between Walls's complex health issues and the resultant increased risk of an intolerably painful death by pulmonary edema. Walls's particularized medical issues are made clear in his complaint and Dr. Zivot's report. NDFL-ECF 1 at ¶¶ 32-38. Essential to Walls's claim, is cause and effect. When administered to Walls, the Protocol will *cause* pulmonary edema when the first drug, an incredibly potent chemical, burns through the delicate capillaries in Walls's already weakened lungs. *Id.* at ¶ 40. The gruesome details of pulmonary edema—and the fact that it has been documented in the autopsies of other prisoners executed by the Protocol and is therefore a known possibility—is crucial to the claim that Walls is in danger of intense pain and suffering, in violation of the Eighth Amendment, should the Protocol be applied to him. *Id.* at ¶¶ 54-59.

Indeed, Walls's demonstrably failing cardiopulmonary health, as outlined in Dr. Zivot's affidavit, indicates that his organs are incapable of withstanding the potent dose of etomidate and will break down quickly. *Id*. at ¶ 38. As discussed in Walls's complaint, he is particularly likely to experience this outcome if the Protocol is administered to him because his poor breathing and low oxygen saturation creates a chemical climate in his body that is conducive to pulmonary hypertension and heart failure upon the injection of etomidate, which will then cause the liver to fail. *Id.* at ¶ 37. This cascade of organ failure will result in the near-certain outcome of death by choking on the resultant backed up blood and fluid, meaning Walls will surely experience and die from pulmonary edema. *Id.*

The risk of a disastrous execution for Walls is exponentially higher in light of Defendants' documented pattern of serious errors. *Id.* at ¶¶ 77-84. The documented errors in Defendants' own records show a pattern of negligence and noncompliance with their own Protocol, meaning that for a vulnerable inmate like Walls, who already faces severe risks, there is an increased likelihood of a torturous death.

In proceedings below, Defendants neglected to even attempt to explain the routine deficiencies in their ability to follow the Protocol. Defendants' silence regarding these allegations, and their impact on Walls, is telling. It is not speculation to plead that, because Defendants have routinely erred in following their own protocol, they are likely to do so again. That in itself is sufficient to support a claim

16

and sets Walls's complaint apart. *Morales v. Tilton*, 465 F. Supp. 2d 972, 975, 981 (N.D. Cal. 2006) (finding that California's inconsistent and unreliable record keeping that resulted in numerous issues in the implementation of its own lethal injection protocol were "likely to recur with considerable frequency," and "[i]n light of the substantial questions raised by the records of previous executions, Defendants' actions and failures to act have resulted in an undue and unnecessary risk of an Eighth Amendment violation."). Given the medical vulnerability here, Defendants are unprepared for the high likelihood of complications during the execution of an ailing prisoner like Walls.

Lastly, Walls proffered a readily available and reasonable alternative, the firing squad. NDFL-ECF 1 at ¶¶ 97-104; *see Glossip,* 576 U.S. at 867. Firing squad is a reasonable alternative because it eliminates the concerns that Walls has raised herein, such as his increased susceptibility to organ failure leading to pulmonary edema, or maladministration of the three-drug lethal injection protocol. The firing squad is currently authorized in five states and has been carried out three times this year. NDFL-ECF 1 at ¶ 99. Furthermore, Walls provided information regarding Defendants' ability to carry out this method, such as its access to the required resources and training. *Id.* at ¶ 102. Walls has therefore met this requirement because a plaintiff in a method-of-execution case "may point to a well-established protocol in another State as a potentially viable option." *Bucklew*, 587 U.S. at 140. Even

17

where an alternative "may require some more time and effort than changing any agency protocol," the "incidental delay" required to make the change does not render the alternative "unavailable" for purposes of the Eighth Amendment standard." *Nance v. Ward*, 597 U.S. 159, 170 (2022).

## B.    Remaining stay factors

The remaining factors for a stay and injunctive relief also weigh in Walls's favor and were not analyzed by the district court. First, Walls will suffer an irreparable injury without a stay or preliminary injunction because he will be executed in a manner that wantonly inflicts pain and suffering, violating the Eighth Amendment. Indeed, as courts have widely suggested, irreparable injury is presumptive under warrant. *See, e.g., Wainwright v. Booker*, 473 U.S. 935, 937 n.1 (1985) (Powell, J., concurring) ("The third requirement that irreparable harm will result if a stay is not granted is necessarily present in capital cases."); *In re Holladay*, 331 F.3d 1169, 1177 (11th Cir. 2003) ("We consider the irreparability of the injury that petitioner will suffer in the absence of a stay to be self-evident."); *Ferguson v. Warden, Fla. State Prison*, 493 F. App'x 22, 26 (11th Cir. 2012) (Wilson, J., concurring) ("As a general rule, in the circumstance of an imminent execution, this court presumes the existence of irreparable injury.").

The irreparable injury in a case challenging a method of execution is not only the execution itself, but also the superadded pain that would occur during that

execution. *Powell v. Thomas*, 784 F. Supp. 2d 1270, 1283 (M.D. Ala.), *aff'd*, 641 F.3d 1255 (11th Cir. 2011) (finding "the alleged irreparable injury is not the fact alone that [plaintiff] will die by execution but that he may experience superadded pain "under present protocols" during that execution) (citing *Baze v. Rees*, 553 U.S. 35, 50 (2008)). This is not only because the pain during execution may be torturous, but also because a violation of constitutional rights is presumed to cause irreparable injury. See *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

A stay would not substantially harm the State. While the State has a legitimate interest in the timely enforcement of valid criminal judgments, it has no legitimate interest in executing Walls via a method that would risk the wanton infliction of pain of suffering in violation of the Eighth Amendment. *See, e.g.*, *In re Holladay*, 331 F.3d at 1177 (finding "no substantial harm that will flow to the State of Alabama or its citizens from postponing petitioner's execution to determine whether that execution would violate the Eighth Amendment").

Finally, granting a stay would not be adverse to the public interest. On the contrary, the legitimacy of the penological system turns on its adherence to constitutional bounds. The public always has an interest in the preservation of constitutional rights and, most certainly, in the humane and dignified carrying out of a death sentence. *See Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986) (The Eighth Amendment seeks "to protect the dignity of society itself from the barbarity of

exacting mindless vengeance" when carrying out an execution.). In this context as well, the people of Florida have a vested interest in finding out what is causing the routine errors in handling execution drugs within its DOC. Thus, it is in the public interest to address and resolve the merits of Walls's claim, and to prevent the unconstitutional risk of causing gratuitous suffering. Allowing the State to execute Walls without meaningful review of whether that execution violates the Constitution is adverse to the public interest—more than any minimal delay that may result from granting a brief stay.

Though delay is, again, not an independent stay factor, it is worth noting, in light of the district court's analysis, that there would be no undue delay associated with staying the proceedings. Walls's complaint is not an eleventh-hour claim generated in reaction to the sudden scheduling of his execution. Rather, the accrual of Walls's complaint hinges on two crucial dates: the noticeable downturn in his health in July 2025, and the receipt of FDOC's error-ridden logs on October 28, 2025. The statute of limitations for such a complaint is two years, Fla. Stat. § 95.11(5). The only reason the timeline of Walls's complaint was forcibly accelerated and consequently painted with any veneer of delay is because the Governor signed Walls's 30-day death warrant. The truncated timeline was imposed by the State with no notice to Walls, and the State had unfettered discretion to do so. Any delay resulting from a stay would thus be attributable to the State, not Walls.

20

## IV.    Conclusion

The Court should grant a stay of execution.

Respectfully submitted,

/s/ Linda McDermott
LINDA MCDERMOTT
   Chief, Capital Habeas Unit

/s/ Sean Gunn
SEAN GUNN

MICHELLE WARD
BAILEY ELLICOTT
Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301-1300
(850) 942-8818
sean_gunn@fd.org

*Counsel for Plaintiff-Appellant*

21

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted in Rule 32(f) and Rule 27(a)(2)(B), it contains 5,069 words.

This document also complies with the typeface requirements of Rules 27(d)(1)(E) and 32(a)(5), and the type-style requirements of Rules 27(d)(1)(E) and 32(a)(6), because it uses a proportionally spaced 14-point font (Times New Roman).

/s/ Sean Gunn
SEAN GUNN

## CERTIFICATE OF SERVICE

On December 10, 2025, this document was served electronically through the CM/ECF filing system.

/s/ Sean Gunn
SEAN GUNN

22